[Civ. No. 19590. Second Dist., Div. Three. Jan. 26, 1954.]

RALPH L. REYNOLDS, Appellant, v. S. ERNEST ROLL, as District Attorney etc., Respondent.

Morris Lavine for Appellant.

Edmund G. Brown, Attorney General, Edward Sumner, Deputy Attorney General, Harold W. Kennedy, County Counsel (Los Angeles), and William E. Lamoreaux, Deputy County Counsel, for Respondent.

WOOD (Parker), J.—The complaint herein alleged that on February 3, 1949, and thereafter the plaintiff was the owner and entitled to the possession of $24,990.91; on said

day William Simpson, the District Attorney of Los Angeles County, entered the premises occupied by plaintiff and took into his possession said sum of money; the defendant Roll herein, who succeeded Mr. Simpson as district attorney, took possession of said money and detains the same without the consent of plaintiff; the said money had not been taken for a tax, assessment, or fine pursuant to a statute or seized under an execution or attachment; plaintiff is informed that said defendant Roll seized said money purportedly pursuant to section 325 of the Penal Code, which provides that all money and property offered for sale or distribution in violation of any of the provisions of this chapter [entitled ''Lotteries''] are forfeited to the state and may be recovered by information filed or by action brought by the attorney general or district attorney in the name of the state; no information or action had been filed for the recovery of the money; the money was not seized by virtue of a search warrant or other legal process; the People of the State of California claim some title to said money, but said claim is without right. The prayer was for the recovery of possession of the money.

The answer alleged that on said date, about 12:30 a. m., Mr. Simpson as district attorney caused the plaintiff to be arrested by representatives of his office and by deputy sheriffs at 5143 Whittier Boulevard, Los Angeles, upon charges of violation of, and conspiracy to violate, sections 319, 320, 322, 323, 326 [regarding lotteries], and 337a [bookmaking] of the Penal Code on said premises; at said time and as a part of the arrest, said officers took from said premises $24,990.91, which was used in the conduct of the overt acts constituting a violation of said sections and constituted the money offered for distribution in violation of the provisions thereof; on June 24, 1949, said plaintiff was convicted in the Superior Court of Los Angeles County of the crime of conspiracy to violate said sections of the Penal Code; said judgment has become final. As a second and affirmative defense, the answer alleged that plaintiff's action is barred by the statute of limitations, particularly by section 340, subdivision 6, of the Code of Civil Procedure.

In a trial by jury the verdict was for defendant. Plaintiff's motion for judgment notwithstanding the verdict was denied, and judgment was entered in accordance with the verdict. Plaintiff appeals from the judgment.

On May 19, 1949, one Kersh, the owner of the ''Club Algiers'' which was operated at the said address on Whittier

Boulevard referred to in the answer, also filed a claim and delivery action against District Attorney Roll wherein he sought to recover possession of $6,900 of said amount of $24,990.91. On December 17, 1951, the People of the State of California filed a petition for a writ of mandate requiring said district attorney to deliver to the state said $24,990.91. The said two cases, last referred to, and the action herein by plaintiff Reynolds were consolidated for trial. Kersh obtained judgment, in a trial by jury, for $6,900. (No appeal was taken therein.) The petition for a writ of mandate was denied by the court. (An appeal is pending in that matter— No. 19784.)

Appellant contends that the judgment is contrary to the law and the evidence.

As above stated, Kersh was the owner of the Club Algiers. Plaintiff (Reynolds) was the manager of the club and his compensation was a percentage of the profits. The club was operated in a building consisting of a large entertainment room, two storage rooms, the manager's office, and a kitchen. In the large room there were dining tables, chairs, a bar, a dance floor, and an orchestra platform. Among its activities the club sold beer, liquor, and meals, and it maintained an orchestra of five or six members, and it conducted dancing and a radio broadcast. Plaintiff hired the employees and bought the food, beer, and other supplies. He also took care of the money received, made the bank deposits, signed all the checks, and paid some bills in cash. Each Saturday and Sunday there were five hundred to eight hundred persons or customers at the club and on other days two hundred to three hundred were there. When drinks were ordered at the bar by a customer he would hand the money to a bartender, and when they were ordered at a table the waitress would pay for them at the bar and then collect at the table. When food was ordered from a waitress, she would pay for it before it left the kitchen and then she would collect at the table. There was no charge for dancing. There was no cover charge except on occasions when there was special entertainment.

Miss Scalph, called as a witness by plaintiff, testified that she was a waitress at the club; that in the latter part of January and the early part of February, 1949, people were sitting at the tables, and lines of people were at the tables; "there was a pyramid"—she "knew there was money going somewhere"; she participated in one of the pyramid clubs.

Mr. McCrilles, when called as a witness by plaintiff, testified that he was a salesman for a radio station; in the first part of 1949 his station broadcast the entertainment for the Club Algiers; during that time he was in the club two or three times a week; it was a busy place. When he was called as a witness by defendant, he testified that he gave a donation of $2.00 to Mrs. Reynolds for some kind of a club at the Club Algiers; about a week later—during the first of the year 1949—when he was at the Club Algiers, they brought a big plate covered with dollar bills and said it was a donation from the East Los Angeles Social Workers Club; then $1,024 was given to him; he believed that the money was handed to him by plaintiff.

Mr. Morris, called as a witness by plaintiff, testified that he was a band leader at Club Algiers; on February 2, 1949, he saw people making donations at the Club Algiers; he had been instructed to keep the dance floor as clear as possible and to try to keep the people who were making donations more or less in line and clear of the dance floor; he made an announcement telling the people who were making donations to keep off the dance floor; he saw Officer Stanley (chief investigator for the district attorney) there that night; about 12:30 a. m. or 1:30 a. m. he received instructions to shut the place down; then he quit playing music and the lights were dimmed. On cross-examination he testified that he joined one of the pyramid clubs—he paid $1.00 to Mrs. Reynolds and she wrote his name on one of the charts; a chart was a large sheet of paper with a group of names in blocks, in the shape of a pyramid, on the sheet; he did not know how many parts of the pyramid club might be termed one club—there might be ten pieces of paper to make one club or there might be one hundred; he collected a prize of $512; it was his custom to play a fanfare when a prize was awarded to a winner; he played three or four fanfares on such occasions in January and February, 1949; on the same day that he won a prize the hat check girl (Miss Grady) also won a prize of $512—he had joined the part of the club which she had joined; six tables were located along the wall in the rear of the main room where money was received from people who wanted to join the pyramid club; plaintiff's office is about 30 feet from the nearest table—a door to the main room is about 20 feet from the tables, and the office is down a hallway about 10 feet from that door; on said day, in that office, plaintiff introduced him to "Mr. and Mrs. Lakhugus," the

winners of the award of $2,500, and then he (witness) went to the bandstand and announced the names of the winners; the money was awarded to them and then they went toward plaintiff's office.

Mr. Roll, the district attorney, who was called as a witness by plaintiff under section 2055 of the Code of Civil Procedure, testified that on February 2, 1949, he was chief deputy district attorney; about noon of said day two men, who said they had been working at the Club Algiers, came to the district attorney's office and made oral complaints of the activities of the Club Algiers; he went to the club about 10 p. m. of said day and at that time there were two hundred or three hundred persons there; there was a large placard on the wall which had on it something about a pyramid club and donating or a dollar contribution; Officer Stanley, the chief investigator of the Bureau of Investigation, and other members of that bureau, and men from the sheriff's office, were there; he saw people giving dollars to people where tables were set up; he saw some of that money being put into large envelopes; he saw a large sum of money brought out from the rear on a tray; they announced that it was $2,500 and that someone had won it; after the members of the sheriff's office and members of the Bureau of Investigation had gone into the office, which was in the rear, and had made the arrest, he (Mr. Roll) went into the office; there was no search warrant, writ of attachment, or writ of execution, or any written process in the possession of any of the officers; the arrest was made upon the basis of violation of certain sections of the Penal Code which occurred in the presence of the officers; he saw money in several places—in a desk drawer that was filled with silver half dollars and dollars; "there was money all over inside and outside the desk"; he saw numerous envelopes with money in them; the envelopes were the same type they were using "on the outside on these one dollar Pyramid Club transactions"; names were on the envelopes; in a storage room he saw a box in which there was at least one hundred dollars in dollar bills; plaintiff and a representative of plaintiff were there when the money was counted; the money came from various places; he gave no receipt for the money; the money was not taken for a tax or assessment. On redirect examination he testified that toward the back of the large room there were some persons behind tables; people would go to them, give their names and a dollar bill to them, and the persons behind the tables would

put the names on a piece of paper; on one or two occasions he saw persons pick up envelopes and take them to the rear of the premises; he saw someone go to the microphone at 11 o'clock and say that the drawing would be postponed until 11:30 and that the ones "who put their money in" would please get in line and put their dollars in; the people would go over and put their dollars in; the "carriers would come back" and later they announced that "Mr. Lakhugus" was the winner—"Lakhugus" being investigator Cimino of the district attorney's office; he (Cimino) went to the platform and was introduced; one or two men from the rear—toward the office—came out with a tray of money; the tray of money was presented to him and then he and the men went toward the rear, taking the money with them.

Officer Stanley, called as a witness by plaintiff under section 2055 of the Code of Civil Procedure, testified that he was the chief of the Bureau of Investigation of the district attorney's office; on said February 2d about 8:30 p. m. he went to the Club Algiers and at that time about one hundred persons were there; about six tables were upon the dance floor; he saw persons taking what they called donations; during the 15 or 20 minutes he was there (the first time) he saw fifty or sixty persons making one dollar donations; he did not hear any conversation between the persons who made the donations and the persons to whom the money was given; he returned to the club about 11:30 p. m. and at that time about four hundred persons were there; he arrested plaintiff at 12:30 a.m.; plaintiff said that he was in charge of the place; eight men from the Bureau of Investigation were there; he (officer) took about $6,900 out of the safe, $260 from a box in a storeroom, over $17,000 in unopened envelopes in the office—some of the envelopes were in a carton under the desk in the office and others were in and on the desk and all over the office; he also took a box of silver coins from a desk drawer; he told plaintiff that if the safe was not opened he would have it hauled away; the officer's secretary and an investigator, in the presence of the plaintiff, counted the money which was taken from the safe; the envelopes were not opened at that time; that money, except the box of coins, was taken to the district attorney's office; the box of coins was left at the club; the money was counted at the district attorney's office in the presence of plaintiff and several other men; he believed that the total amount was

$24,990.91; the money was placed in a safe in his office for several hours and then it was placed in a safe deposit box in a bank. On redirect examination he testified that some two hundred envelopes with money in them were taken from the club office, and that the envelopes had names on them; some of the envelopes were used as exhibits in the criminal trial.

Officer Stanley, when called as a witness by defendant, testified that he saw girls at tables taking money from persons who went to the tables; that the girls put the money in envelopes; the envelopes were delivered to plaintiff's office; he (officer) assigned an investigator, Nick Cimino, to the Club Algiers case; when he (Officer Stanley) was at the club on the night of February 2d about 12:30, the band leader announced that a payment of $2,500 would be made; then Cimino and a girl went up to the platform; a tray full of currency was presented to them; then Cimino, accompanied by the girl and two bodyguards, carried the tray of money to the club office; within about two minutes thereafter Officer Stanley went into the office and found that Cimino had plaintiff in a corner; then Officer Stanley took a gun away from plaintiff and put handcuffs on him; there was a little over $1,000 on the tray; he asked plaintiff why he had so much money lying around in the office; he replied that he had started this pyramid club as a rib and that it got so big it got away from him and the money came in so fast he could not handle it; he said that he had not had time to open the envelopes; he (officer) did not take any money from the cash register behind the bar; all the money he took came from the club office except $160 ($260) that was in a storeroom adjoining the office.

Mr. Yessian, called as a witness by defendant, testified that he had been employed at the club about 10 days before the arrest; he collected money from the six or seven tables where girls were writing names and taking money for the pyramid club; before the girls put the money in an envelope, he would check the amount of money with the lists; then they would put the money in the envelope, write the amount and their names thereon, and give the envelope to him; after a few envelopes accumulated he took them to plaintiff's office and gave them to plaintiff; there were lines at the tables, in the evenings, which at times would extend outside and around the corner; $3,000 was taken into the office during the last day he was there; on the morning of February 2d he

told plaintiff that the people were demanding that the $2,000 prize be given and he asked plaintiff if he was going to give it; plaintiff replied that he had not found anybody to take the donation; he (witness) said that he would find somebody to take the place of Lakhugus, "that phony name he had up there"; thereafter Yessian went to the district attorney's office and had a conversation with Officer Stanley; he told the officer that there was going to be a $2,000 pay-off at the club if they could find somebody to receive the money in the name of Lakhugus; the officer introduced him to Cimino; later Cimino introduced him to Rose, his sister-in-law; then Yessian took Cimino to plaintiff's office and introduced him as Cimino, the brother-in-law of Yessian; Yessian told plaintiff he had found somebody to take the phony pay-off; plaintiff asked if he knew the score, and Yessian replied that he had told him all about it; just before the pay-off Yessian, Cimino, and Rose were in plaintiff's office; she was introduced as Cimino's wife; plaintiff gave Cimino the name "Lakhugus" and told him to remember it—that he would call him to the bandstand and he would receive the money, and after that he should bring the money to the office and plaintiff would fix him up; then he gave Cimino $20; the name was called and it was said that Mr. and Mrs. Lakhugus should come to the stand and receive $2,000; Cimino and Rose went up and received the money and then there were a few speeches; when they returned to the office with the tray of money and put it on plaintiff's desk, plaintiff gave Cimino $10. Yessian testified further that he had pleaded guilty in 1937 to larceny from the person and was sentenced to the penitentiary.

Nick Cimino, called as a witness by defendant, testified that he was an investigator for the district attorney; pursuant to an assignment by Officer Stanley, he went to the Club Algiers on the evening of said February 2d, he was introduced to plaintiff by Yessian as Nick Cimino, his brother-in-law, who was ready to accept the phony pay-off; plaintiff asked if Cimino knew what was going to happen; Cimino told plaintiff that he did not have to worry; plaintiff said that Cimino and his wife would receive a $2,048 pay-off with the understanding that the money was to be returned to him; he also said that he would fix Cimino up for his trouble. He testified further that on said February 2d, six tables were in the rear of the main or large room, and ladies were sitting behind the tables; on the tables there were sheets of paper

with squares thereon which were in the shape of a pyramid; also on the tables there were long envelopes and pencils; in front of the tables people were lined up and were holding money in their hands; as the ladies received the money they would make notations in the squares on the paper, and the money was placed in an envelope; when a certain amount of money had been accumulated in an envelope, the envelope was sealed and handed to an employee who would then take it to the office of plaintiff. He testified further that about 11:30 p. m he, the lady who posed as Cimino's wife, and Yessian went into plaintiff's office; plaintiff said that Cimino was not to be known as Cimino and he wrote the name Lakhugus on a paper and asked him to remember the name; then he told them that the band leader would call Mr. and Mrs. Lakhugus as the lucky winners; he also said that after they had been handed a tray full of money, they would be escorted back to his office where they were to return the money to plaintiff; then he gave Cimino $20 and said that was for his trouble; after said names were called, they went to the stand and Yessian handed them a tray full of money; when they returned to the office plaintiff allowed them to enter and Cimino returned the money to plaintiff, and plaintiff handed him $10; then Cimino arrested plaintiff; a moment later Officer Stanley entered the office. He also testified that he was present on February 3, 1949, when Deputy District Attorney Barnes asked plaintiff questions, and at that time plaintiff said that the money that had accumulated for the pyramid clubs did not belong to him, that it belonged to an organization known as the East Los Angeles Social Club which he permitted to use the Club Algiers.

Officer Graham, a deputy sheriff, called as a witness by defendant, testified that on January 31, 1949, about 5 p. m. when he went to the club, there were four lines at tables where donations and names were taken; he had to stand in line about 30 minutes before he got to a table; he gave $1.00 to a girl at a table and she placed his name, address, and telephone number in a square on a paper; she stated that it would take about two weeks for his name to reach the top of the pyramid and that he would be notified when his name approached the top; she placed the money in a box; he saw other persons contributing a dollar; later there were six tables in operation; he saw a person take the collections and sheets of paper to the office of plaintiff; he was present on the night of February 2d when plaintiff was arrested; after

the arrest plaintiff told him that he had not left his office for two weeks—shortly after the pyramid club started, that he had too much money in the office and he could not leave it, that he felt that the growth of the club was about to crush him, and that his arrest took a great weight off his shoulders.

This action was commenced on January 31, 1952—about three years after the money was taken.

Appellant argues that since it is undisputed that he was in possession of the money and since possession creates a presumption of ownership, he was entitled to rest his case upon that presumption. He argues further that such presumption was not overcome by evidence to the contrary; that the evidence introduced by defendant relating to the manner in which plaintiff acquired possession did not constitute a defense; that appellant established his right to possession (except as to $2,500 given as a prize) without relying upon any illegal transaction; that defendant took the money without any right thereto and without any warrant or other legal process therefor; that the money was not used as evidence in a criminal trial; that since no action to forfeit the money was commenced and since such an action was barred by the statute of limitations, defendant was not entitled to judgment upon the basis of a forfeiture. Appellant therefore asserts that he is entitled to possession of the money, except as to $2,500 (given as a prize) and the $6,900 (taken from the safe—for which Kersh obtained judgment).

There was no action by defendant to declare a forfeiture, and it is conceded that a forfeiture is not involved herein.

Appellant did not testify. He rested his case upon a presumption of ownership of the money. The jury could have found that the presumption of ownership on the part of appellant was overcome by the evidence that Kersh was the owner of the Club Algiers and that appellant was the manager whose compensation was based upon a percentage of profits; and that plaintiff said, at the time of the arrest, that the money did not belong to him. If the jury so found (that appellant was not owner of the money), then the presumption of ownership was dispelled and the only remaining basis for appellant's claim to a right of possession was that he as manager or agent for Kersh (the owner) had the right to possession. In view of the issues presented, there is an implied finding in the verdict of the jury that the claim of appellant for the return of the money was based upon an illegal

transaction. ▆ It is a "settled principle that the courts will not lend assistance to persons whose claim for relief rests on an illegal transaction." (*Lee On* v. *Long,* 37 Cal.2d 499, 500 [234 P.2d 9].) It was also said in the case just cited at page 502, in quoting from 17 Corpus Juris Secundum, section 272, page 656: " 'No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim.' " In said case of *Lee On* v. *Long, supra,* a sheriff had seized dice, playing cards, lottery tickets, and money from tables at which the plaintiffs were seated. Two cases therein were tried upon the same evidence—in one case the county sought an order authorizing the confiscation of the gambling paraphernalia and the forfeiture of the money, and in the other case the persons seated at the tables (plaintiffs) sought a return of the money. The trial court therein ordered the confiscation of the paraphernalia but, with respect to the money, it denied both the county's petition for a forfeiture and the other plaintiffs' prayer for a return of the money. The judgment therein was affirmed. It was said further in that case at page 502, in quoting from other cases, that " 'the test . . . is whether the plaintiff can establish his case otherwise than through the medium of an illegal transaction to which he himself is a party,' " and " 'If the plaintiff cannot open his case without showing that he has broken the law, the court will not assist him, whatever his claim of justice may be upon the defendant.' "

▆ In. the present case the evidence was sufficient to support a finding that plaintiff's claim for a return of the money was based upon an illegal transaction. It is conceded that $2,500, the sum which allegedly was on the tray and purportedly was awarded as a prize, is not recoverable by plaintiff. Approximately $17,000 of the money which plaintiff is claiming was in envelopes upon which names and amounts were written. The evidence shows that the persons who were at the tables, receiving the $1.00 and $2.00 donations from persons who were in the lines at the tables, placed the money in envelopes and wrote names and amounts thereon. Those envelopes, which were of the same appearance as the envelopes containing the money involved here, were taken to plaintiff's office. Envelopes containing. the $17,000 (approximately) involved here were found, by the officers at the time

of the arrest, under, in, and upon the desk in the office and all over the office. The evidence was sufficient to prove that the receipt of the sums of $1.00 and $2.00, the registering of names of the persons from whom the sums were received, and the awarding or purported awarding of prizes in approximate sums of $500, $1,000, and $2,500 to a few of the persons whose names allegedly were so registered constituted a lottery, and such transaction was illegal under provisions of the Penal Code. The evidence supports a finding that the claim of appellant was based on an illegal transaction.

The case of *People* v. *Grant*, 52 Cal.App.2d 794 [127 P.2d 19], upon which plaintiff relies, is distinguishable from the present case. In that case the plaintiff sought a forfeiture of money, and the defendant sought a return of the money. The court said that the trial proceeded on the theory that defendant's ownership of the money was admitted. In the present case the ownership of the money was an issue.

The evidence would support a finding that appellant was arrested and the money was seized by officers of the district attorney's office upon the basis of violations by appellant, in the presence of the officers, of sections of the Penal Code which denounce lotteries and various activities in connection therewith as crimes. The evidence would also support a finding that the money was taken for the purpose of using it as evidence in a trial of appellant upon criminal charges, and for the purpose of having it available as the subject matter of a forfeiture action. Also the evidence would support a finding that the officers who arrested appellant and took the money did not unlawfully enter the Club Algiers or appellant's office therein. They entered the main room of the club during the time when it was open and operating as a place where the public was invited, and Officer Cimino, who arrested appellant in appellant's office, entered the office at the direction and invitation of appellant (when he was directed by appellant to return the tray of money to the office.) Officer Stanley went into the office within a minute or two after Officer Cimino had entered.

Appellant contends that an instruction given, on the court's motion, was erroneous.[1]

---

[1] "You are instructed that one of the defenses set up by the pleadings in this case by the defendants in their answers to both cases, the case of RALPH L. REYNOLDS, Plaintiff, vs. E. ERNEST ROLL, Defendant, and COSMA C. KERSH, Plaintiff, vs. E. ERNEST ROLL, Defendant, separate, distinct and apart from any forfeitures, is that the moneys taken into

He argues that the statement in the instruction to the effect that the rule is not limited in its application to the parties to the illegal transaction could not have been understood by the jury as meaning other than that a third party in possession of the property could defend upon the ground that plaintiff had obtained it as a result of an illegal transaction. He argues further that the statement therein to the effect that the test of the rule is whether the plaintiff can establish his case otherwise than through the medium of an illegal transaction could not have been clear to the jury. He argues further than the statement therein that in such cases the illegal nature of the transaction if any creates a disability in plaintiff meant that the burden was on plaintiff to show that he had come by the property lawfully. It appears that the instruction was based upon the opinion in the case of *Lee On* v. *Long, supra,* 37 Cal.2d 499. The instruction was not erroneous.

■    Appellant contends that another instruction given, on the court's motion, was erroneous.[2] He argues that, by

---

legal custody by the District Attorney and his agent on February 3, 1949, were seized and held and still are in the custody of said District Attorney, which moneys were actually offered for and in a lottery and were used in the conduct of overt acts constituting a violation of the Penal Code section, to wit: the crime of conspiracy and violation of Sections 319, 320, 322, 323, 326 and 337a of the Penal Code of the State of California and said money used actually engaged in illegal gambling activity at the time of the raid and their arrest.

"These are the affirmative allegations of the answers as hereinbefore given to you and more particularly in these instructions. The burden of the proving of these affirmative allegations of the answers by a preponderance of the evidence are upon the defendant. Testimony has been produced by the defendants in support of their affirmative allegations of their answers.

"You are instructed in this connection that the law is as follows:

" 'No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim.'

"It is the law that this rule is not limited in its application to parties to the illegal transaction as distinguished from an attempt to set up a claim against a third party based on the law's violation. And you are instructed that the test of the application of this rule is whether the plaintiff can establish his case otherwise than through the medium of an illegal, unlawful transaction to which he, himself, is a party. It is the law that if the plaintiff cannot establish his case without showing that he has broken the law, the court will not assist him whatever his claim of justice may be upon the defendant. And in such cases the illegal or unlawful nature of the transaction if such exists, creates a disability in the plaintiff."

[2] "Whenever in these instructions I refer to a presumption, I mean one that may be rebutted. The fact that such a presumption arises must never be taken to mean any change in the rule of burden of proof. To

the instruction, it was intimated that a presumption alone is not sufficient to sustain the burden of proof. That instruction was not erroneous. Furthermore, it is to be noted that the court gave an instruction, requested by plaintiff, as follows: "If you believe from the evidence that at the time of the seizure of money here concerned Ralph Reynolds was managing the Club Algiers, that fact standing alone is sufficient to create a presumption that he was entitled to the possession of all of the money in the building occupied by Club Algiers except such as was upon the person of customers or employees therein, and unless that presumption is overcome by evidence, you must find in accordance with it."

Appellant asserts further that the court erred in giving and refusing other instructions. He refers generally to various instructions. It is not necessary to set forth those instructions and discuss them in detail. Considering all the instructions together, it appears that the jury was instructed adequately.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 25, 1954. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.

---

explain this point more fully: A party against whom such a presumption is directed, if he intends to deny it, must, of course, present evidence to the contrary, but if the burden of proof on the issue to which the presumption relates does not rest on him, it is not necessary for him to overcome the presumption by a preponderance of the evidence. In that case, with the burden of proof resting on the party in whose favor the presumption is invoked, the presumption, together with any other evidence supporting it, to justify a finding in accordance therewith, just [must] have more convincing force than the contrary evidence."