Samuel KAPSON, Plaintiff,
v.
Erwin H. KUBATH, Defendant.
Civ. A. No. 2289.

United States District Court
W. D. Michigan, S. D.
Aug. 27, 1958.

Robert H. Moore, Gary, Ind., and Charles W. Gore, Benton Harbor, Mich., for plaintiff.

Alexander, Cholette, Buchanan, Perkins & Conklin, and Paul E. Cholette, Grand Rapids, Mich., for defendant.

STARR, Chief Judge.

Plaintiff Kapson, a citizen of Indiana, brought this action against defendant Kubath, sheriff of Berrien county, Michigan, and his surety, the Hartford Accident and Indemnity Company, claiming damages for the alleged unlawful confiscation, destruction, and damaging of certain real and personal property owned by the plaintiff and located in LaPorte county, Indiana. To consider and determine the issues presented, it is necessary to set forth the factual situation out of which the litigation arose.

The plaintiff was the owner of certain land intersected by the boundary line between the States of Indiana and Michigan, a portion of said land being located in Indiana and a portion in Michigan. The plaintiff owned four buildings located on this land, which were designated and referred to in the trial of this action as buildings A, B, C, and D. Building A was located in Michigan except for a small triangular portion thereof, which was in Indiana; about two thirds of building B was located in Indiana and about one third in Michigan; buildings C and D were located entirely in Indiana. Building C, which is the only building involved in this action, was a two-story building generally referred to as the Sportsmans Club or the State-Line bookie. Gambling operations, including horse-race betting, were conducted in this building during the summer months. The plaintiff owned the furnishings and equipment in building C and received one third of the profits from the gambling operations as rental for the building and the furnishings and equipment located therein. In August, 1951, the plaintiff went on a visit to his native land of Greece and did not return to Indiana until November 9th or 10th of that year. While he was absent from the country, his brother and two other men were left in charge of the building and the gambling operations and other activities.

On Labor Day, September 3, 1951, the defendant as sheriff of Berrien county, Michigan, and eight of his deputies, accompanied by officers of the Michigan State police, officers of the sheriff's department of LaPorte county, Indiana, and Indiana State police, conducted a raid upon the Sportsmans Club in building C, which was located entirely in Indiana. The raid was conducted without warrants for arrest or search. The evidence clearly establishes that defendant Kubath as sheriff of Berrien county actively participated in the raid and, acting alone or in cooperation with the prosecuting attorney of Berrien county, actively directed or acquiesced in the confiscation of certain moneys found in building C and the damaging of the building and the destruction or damaging of certain property located therein. It appears that the air-conditioning system and certain of the electrical wiring and lighting fixtures in building C were torn out and at the direction of the defendant were removed to Berrien county, Michigan. The ceilings, walls, and other parts of the building were damaged, two mahogany bars and a built-in desk or counter were destroyed, and other personal property in the building was destroyed or damaged. The defendant arrested, or caused to be arrested, six operators of the gambling establishment and caused them to be removed to the Berrien county jail. The defendant arrested, or caused to be arrested, some 50 or more patrons of the gambling operations in building C, and these patrons were also removed to the Berrien county jail. The defendant took posses-

sion of and removed about $460 which was found in the gambling establishment in building C and also took possession of and removed a cash box found in that building containing, according to his testimony, $8,000 in money.

At this point it should be noted that upon a hearing in the circuit court of Berrien county the six operators of the gambling establishment, who had been arrested in Indiana and removed to Michigan, were discharged, when the evidence established that building C was located entirely in Indiana and there was no proof that the operators had committed any offense in Michigan. It should also be noted that upon stipulation of all counsel the action was dismissed as to defendant's surety, the Hartford Accident and Indemnity Company, on the ground that it was surety for defendant in his capacity as sheriff of Berrien county, Michigan, and that he was not acting in that capacity in conducting the raid in Indiana.

The plaintiff began the present action to recover for the damages to building C and for the destruction and damaging of certain property located in that building, and for the sum of $2,000 of money which he claims was in the confiscated cash box, over and above the sum of $8,000 which the defendant admits was in the box when it was removed from building C. It should be kept in mind that, as stated on the record by counsel, the plaintiff makes no claim in this action for said sum of $8,000 or for the value of gambling equipment and furniture and furnishings removed from building C and transported by the defendant or under his direction to Berrien county.

In his complaint plaintiff alleges that defendant Kubath as sheriff of Berrien county, Michigan, acting wholly without jurisdiction or authority in the State of Indiana, wilfully and maliciously damaged the plaintiff's buildings, destroyed or damaged property located in the buildings, and confiscated certain moneys belonging to him. Defendant filed answer alleging that the plaintiff's property was situated partially in Indiana and partially in Michigan, and that gambling operations were illegally conducted and intoxicating liquors were illegally sold on the premises; that defendant and his deputies and the Michigan State Police and the sheriff of LaPorte county, Indiana, and his deputies and the Indiana State police all participated in the raid upon the premises; that the defendant and his deputies and the Michigan police officers had charge of the raid operations in Michigan and that the sheriff of LaPorte county, Indiana, and his deputies and the Indiana State police had charge of the raid operations in Indiana. The defendant further alleged that his acts and doings were under the direction, order, and authority of the sheriff of LaPorte county, Indiana; that it was his legal duty to assist the Indiana officers in that county; and that certain personal property found upon the premises in Indiana was seized and was removed to Berrien county, Michigan, under the direction and order of the sheriff of LaPorte county. The defendant further alleged that in the conduct of the raid he seized money in the total amount of $8,460 and that this seizure was made under the authority of the sheriff of LaPorte county. The defendant expressly denies that any sum in excess of $8,460 was seized and removed, and denies that plaintiff is entitled to the relief sought.

The action was tried to the court without a jury. It is significant that the defendant admitted that prior to the raid he did not know whether building C, in which the Sportsmans Club was operated, was located in Michigan or in Indiana. The prosecuting attorney of Berrien county, who conferred with the defendant and advised him prior to the raid, testified that a survey would have determined the location of building C but that a survey was not made because that would have disclosed the fact that a raid was planned. There is no showing that any proper effort was made prior to the raid to determine the exact location of building C and whether it was located in Michigan or Indiana. The

defendant admitted that he took part in the planning and conducting of the raid and that he directed the activities of his deputies. The testimony indicates that the prosecuting attorney of Berrien county was present during a part of the raid and that he advised the defendant and directed the destruction or removal of certain personal property in building C.

The plaintiff contends that defendant, sheriff of Berrien county, Michigan, became a private citizen and a trespasser and acted wholly without jurisdiction or authority when he entered upon the plaintiff's premises in Indiana, and therefore became liable for the damages perpetrated, caused, permitted or condoned by him and his deputies and other officers and persons. On the other hand, defendant claims in effect: (1) That any acts by him or his deputies in the State of Indiana were lawfully done under the direction of the sheriff of LaPorte county; (2) that by engaging in the commission of illegal and immoral acts plaintiff is precluded by public policy from maintaining this action and recovering damages; (3) that the raid upon plaintiff's premises was a cooperative effort and was not conducted, accomplished or directed solely by the defendant; and (4) that the seizure, destruction or damaging of plaintiff's property in Indiana was initiated, carried out, and completed pursuant to the orders of the prosecuting attorney of Berrien county.

■ It is a well-established rule that the power and authority of a county sheriff are limited to the confines of his county and that when he exceeds that jurisdiction he is acting as a private citizen. In McLean v. State of Mississippi ex rel. Roy, 5 Cir., 96 F.2d 741, at pages 744, 745, 119 A.L.R. 670, certiorari denied 305 U.S. 623, 59 S.Ct. 84, 83 L.Ed. 399, which involved an action on a Mississippi sheriff's surety bond for acts of the sheriff outside the State of Mississippi, the court held:

"The state law, like the common law, confines a sheriff's duties to the county in and for which he is elected.

* * * The State of Mississippi has no power to extend the authority of its sheriffs into another State, and we will not suppose she has made the attempt. * * * In Louisiana and again in Tennessee he (the sheriff) did not, because he could not, act either virtute or colore officii. He had neither office nor color of office as a Mississippi sheriff while in another State, where Mississippi laws were not of force. * * * In such other State he is only a private citizen."

"At common law, a sheriff has no jurisdiction beyond the borders of his county, the rule being that the acts of an officer outside of his county or bailiwick are unofficial and necessarily void unless expressly or impliedly authorized by some statute. A sheriff is in no better or different position than a private citizen when he makes arrests beyond the limits of his county." 47 Am.Jur. p. 842, § 29.

"Since the sheriff is a county officer, his authority extends over the entire county, and includes all municipalities and townships within his county. As a general rule, however, his authority, and the authority of a deputy sheriff appointed by him, are limited to his own county." 80 C.J.S. Sheriffs and Constables § 36, p. 205.

■ Examination of the law of Michigan, Mich.Const.1908, Art. VIII, §§ 3, 4, and 5, and Comp.Laws Mich.1948, §§ 45.407, 51.68, indicates that a Michigan sheriff's jurisdiction is restricted to the county in which he is elected. Therefore, any acts of defendant Kubath outside of Berrien county, Michigan, and in the State of Indiana must be treated as the acts of a private citizen.

See also Kirkes v. Askew, D.C., 32 F.Supp. 802, 804; State ex rel. Penrod v. French, 222 Ind. 145, 51 N.E.2d 858, 149 A.L.R. 1084; Merchants Credit Service, Inc., v. Chouteau County Bank, 112 Mont. 229, 114 P.2d 1074; Taylor

v. Town of Wake Forest, 228 N.C. 346, 45 S.E.2d 387.

As the plaintiff's claim for damages is based upon damage to his property located in Indiana, it is clear that certain of the legal issues in this action should be determined under the law of that State. As stated in W. W. Clyde & Co. v. Dyess, 10 Cir., 126 F.2d 719, 721:

"But with rare exceptions matters relating to the right of action arising out of a tort which results in death, personal injury, or other wrong, are governed by the law of the place where the tort occurred. Northern Pacific Railroad Co. v. Babcock, 154 U.S. 190, 14 S.Ct. 978, 38 L.Ed. 958; Slater v. Mexican National Railroad Co., 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900; American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826, 16 Ann.Cas. 1047; Cuba Railroad Co. v. Crosby, 222 U.S. 473, 32 S.Ct. 132, 56 L.Ed. 274, 38 L.R.A., N.S., 40; Vancouver Steamship Co. v. Rice, 288 U.S. 445, 53 S.Ct. 420, 77 L.Ed. 885; Young v. Masci, 289 U.S. 253, 53 S.Ct. 599, 77 L.Ed. 1158, 88 A.L.R. 170; Hunter v. Derby Foods, Inc., 2 Cir., 110 F.2d 970, 133 A.L.R. 255."

See also Howard v. Pulver, 329 Mich. 415, 45 N.W.2d 530; Bostrom v. Jennings, 326 Mich. 146, 40 N.W.2d 97; Summar v. Besser Manufacturing Co., 310 Mich. 347, 17 N.W.2d 209.

It is clear that under the law of Indiana the gambling operations being conducted by plaintiff and his partners in the Sportsmans Club in building C were illegal. See Burns' Ind.Stat., 1956 Repl., §§ 10–2304, 10–2307, 10–2311, 10–2312, 10–2326.

Defendant claims that at the time of the raid on the Sportsmans Club in building C, intoxicating liquors were being illegally furnished and sold upon the premises. Plaintiff concedes that he did not possess license or author-ity to sell alcoholic beverages in Indiana, and as provided in Burns' Ind.Stat., 1956 Repl., § 12–302, no person may lawfully furnish or sell alcoholic beverages for commercial purposes without a license. While there is some evidence from which it might be inferred that intoxicating liquors were furnished and sold on the plaintiff's premises and that certain patrons of the gambling establishment were intoxicated at the time of the raid, the evidence presented is not convincing and does not satisfactorily establish that intoxicating liquors were furnished and sold or that plaintiff violated any Indiana law regarding alcoholic beverages.

Certain of the duties of Indiana police officers with respect to gambling operations in Indiana are set forth in the following provisions of Burns' Ind.Stat., 1956 Repl.:

§ 9–1024. "All judicial officers, sheriffs, deputy sheriffs, coroners, constables, marshals, deputy marshals, police officers, watchmen and the conductors of all trains or cars carrying passenger or freight within this state, while on duty on their respective trains or cars, may arrest and detain any person found violating any law of this state, until a legal warrant can be obtained."

§ 49–2802 (1951 Repl.). "Such sheriff shall be a conservator of the peace within his county; shall arrest, without process, all persons who, within his view, shall commit any crime or misdemeanor, take them before the nearest justice of the peace of the county and detain them in custody until the cause of such arrest has been investigated."

§ 9–601. "Justices of the peace, judge of any city court or magistrate's court or the judge of any court of record, *may issue warrants to search any house or place:* * *

"For any gambling table, establishment, device or apparatus kept for the purpose of unlawful gaming, or to win or gain money or other

property, or for any money or other property won by unlawful gaming."

§ 9–604, as amended in 1947. "(a) When the warrant is executed by the seizure of the property or things described therein, *all such property and things so seized shall be delivered immediately by any such justice of the peace, judge or officer having custody thereof, to the sheriff of the county;* failure to deliver all such property and things seized to the sheriff of the county shall be a misdemeanor, punishable by a fine in any sum not exceeding five hundred dollars."

§ 9–605. "The sheriff of the county so receiving such property or thing so seized shall forthwith destroy or cause to be destroyed *if ordered to do·so by the court, such order to be made only after ten [10] days' notice to the person in whose possession such property was found,* or to the owner, if he be known, and an opportunity afforded to him for a hearing, all slot machines, gaming tables, Jenny Lind tables, roulette tables or roulette wheels, keno outfits, wheels of fortune, bagatelle tables, pigeon hole tables, bookmakers' tables or bookmakers' wheels, klondike tables, or any other gaming apparatus, device, table or machine of any kind or description, under any denomination or name whatever. *All other property or things so seized shall be safely kept and securely held by the sheriff,* either in the county jail of his county, or such other place as to him shall seem meet, subject to the order of the court trying the offender, and, on the conviction of the person so offending, such sheriff shall forthwith, in the presence of the person or persons upon whose complaint the seizure or arrest was made (if he or they shall, after notice thereof, elect to be present), *destroy or cause to be destroyed,* the counterfeit coins, dice and instruments, gaming devices and apparatus not heretofore designated, burglars' tools and other articles used for unlawful purposes, and the obscene, lewd and indecent articles and things above mentioned, and as to all other property not required by the sheriff [justice] to be forthwith destroyed, or destroyed after conviction, the sheriff shall deliver the same, under the order of the court trying the offender, to the proper owner thereof. The provisions of this act shall apply to all such property or things now in the possession of either of said officers."

■ Examination of the above Indiana statutes and the law of that State fails to show any authority by which an Indiana police officer is entitled to seize property or equipment connected with illegal gambling operations without a warrant or to destroy the same without a court order or to release the custody of the property to an out-of-State sheriff. Sections 9–604 and 9–605 quoted above expressly require that even gambling equipment be turned over to the appropriate Indiana sheriff and held intact by him until ordered destroyed by an Indiana court. In State v. Robbins, 124 Ind. 308, 24 N.E. 978, 980, 8 L.R.A. 438, the court said:

"Unless, therefore, articles seized are of such a character that the law will not recognize them as property entitled, as such, to its protection, under any circumstances, *they cannot be summarily destroyed without affording the owner an opportunity to be heard upon the subject of their lawful use,* and to show whether or not the articles are intrinsically useful or valuable for any other purpose than gambling, or whether their only recognized value and customary use is as implements for gaming."

See also State v. Derry, 171 Ind. 18, 85 N.E. 765.

■ Therefore, it is clear that the Indiana police officers who participated in the raid involved in this case were

acting beyond the scope of their authority and jurisdiction if they in fact destroyed or damaged any of plaintiff's property or released custody of it to defendant and his deputies. It may be noted that an Indiana State police officer testified that none of the Indiana police officers taking part in the raid participated in the seizure and confiscation of the property indirectly connected with gambling operations, and further, that he had advised the prosecuting attorney of Berrien county that on a gambling raid in Indiana an officer may seize property which is purely gambling equipment and fixtures, but may not seize other property or equipment.

Defendant contends that any acts by him or his deputies within the State of Indiana were lawfully done under the direction of the sheriff of LaPorte county. In support of this contention he calls attention to Burns' Ind.Stat., 1956 Repl., § 10–1006, which provides:

"Whoever, when required by any sheriff or his deputy, or by any coroner, constable, or any conservator of the peace, to assist him in the execution of his office or in the service of any process, shall refuse or neglect to render such assistance, without having a valid cause for so refusing or neglecting, shall, on conviction, be fined not less than five dollars [$5.00] nor more than one hundred dollars."

While there is some testimony from which it might possibly be inferred that defendant and his deputies were acting under the direction of the sheriff of LaPorte county, Indiana, in the conducting of the raid, it is significant that no Indiana police officer testified to that effect, and that the sheriff of LaPorte county was not called as a witness although there is no showing that he was not available. Furthermore, it is clear that under the law of Indiana neither the sheriff of LaPorte county nor anyone acting under him had authority to destroy or order the destruction or damaging of plaintiff's property or to release custody of it to the defendant as an out-of-State sheriff. Furthermore, cognizance must be taken of Burns' Ind. Stat., 1956 Repl., § 10–4905, which provides:

"*No sheriff* or other person authorized by law to appoint special deputies, marshals or policemen to preserve the public peace *shall hereafter appoint as such special deputies, marshals or policemen any persons who shall not have resided continuously in this state at least one [1] year, and in the county where such appointment is made at least six [6] months, prior to the date of such appointment; and no person*, company, association or corporation *shall bring into this state any person or association of persons for the purpose of discharging the duties devolving upon sheriffs* and other peace officers in the protection of life and property and the punishment of crime; nor shall any person, without due authority, exercise or attempt to exercise the functions of, or hold himself out to any one, or act or attempt to act as, a deputy sheriff, marshal, policeman, constable or other peace officer. Any person who shall violate any of the provisions of this section shall, on conviction, be imprisoned in the state prison not more than one [1] year and be fined in any sum not exceeding five hundred dollars."

While under § 10–1006 hereinbefore quoted an Indiana sheriff or his deputy may require a person to assist him in the execution of his office, § 10–4905 quoted above prohibits an Indiana sheriff from appointing persons as special deputies or policemen who have not resided continuously in that State for at least one year, and prohibits his bringing persons into the State for the purpose of discharging the duties of Indiana sheriffs. Therefore, it is clear that the sheriff of LaPorte county, Indiana, could not legally have appointed the defendant or his deputies, who were all Michigan residents, as special deputies or officers, or have authorized them to act

in Indiana. In any event, the evidence does not satisfactorily establish that the sheriff of LaPorte county, Indiana, required defendant to make or assist in the raid, or that he appointed the defendant or his deputies as Indiana police officers, or that he directed the activities of defendant and his deputies.

Defendant also contends that the plaintiff, by engaging in the commission of, or permitting the commission of, illegal acts upon his premises, is precluded by public policy from maintaining this action for damages. In support of this contention defendant cites Desmet v. Sublett, 54 N.M. 355, 225 P.2d 141, and Reynolds v. Roll, 122 Cal.App.2d 826, 266 P.2d 222. However, a careful study of those cases clearly indicates that the factual situations and legal issues involved distinguish them from the present case and that they do not support defendant's contention. The holding in Trout v. Brown, 125 Ind.App. 381, 123 N.E.2d 647, is not applicable to the facts and circumstances involved in the present action. In 1 C.J.S. Actions § 13, pp. 1000, 1001, it is stated:

"An action may be maintained where the illegal or immoral act or transaction to which plaintiff is a party is merely incidentally or collaterally connected with the cause of action, and plaintiff can establish his cause of action without showing or having to rely upon such act or transaction, although the act or transaction may be important as explanatory of other facts in the case."

"The fact that plaintiff is making an illegal or immoral use of his property, or intends to put it to an illegal use, furnishes no excuse for trespassing thereon." 87 C.J.S. Trespass § 39, p. 994.

"Illegality is no defense when merely collateral to the cause of action sued on; as one offender against the law cannot set up as a defense to an action the fact that plaintiff was also an offender, unless the parties were engaged in the same illegal transaction. It is only in such a case that the maxim, 'in pari delicto potior est conditio defendentis et possidentis,' applies, and not even when the plaintiff's unlawful participation was innocent, being induced by the fraud of the defendant on which the action is based." 1 Am.Jur. p. 415, § 16.

It is manifest that the plaintiff was engaged in illegal gambling operations or permitted illegal gambling operations on his premises, and that there was in his possession, or at least under his control, certain illegal gambling equipment. However, it should again be noted that in this action plaintiff seeks to recover only for a certain sum of money allegedly seized, and for damages to building C, and for the destruction or damaging of certain property located in the building, all of which property was only indirectly connected with the gambling operations. The plaintiff is not claiming damages for the seizure or destruction of any gambling equipment. However, defendant contends that the seizure, destruction or damaging of property incidental to the gambling operations was lawful and necessary in order to terminate the illegal operations. This contention is without merit, as under the Indiana statutes hereinbefore quoted neither defendant nor any Indiana police officer had the right or authority to destroy or order the destruction of the gambling equipment at the Sportsmans Club or of any property indirectly connected with the gambling operations. It is clear that the damage or destruction of property owned by the plaintiff in the State of Indiana by the defendant sheriff of Berrien county, Michigan, or by his deputies under his direction, or by other persons with his approval or acquiescence, was unlawful. Under defendant's theory and contention, carried to its logical conclusion, the plaintiff would be without recourse even though the defendant had completely destroyed building C on the ground that it was necessary and essential to the gambling operations therein.

As stated in Cook v. Ball, 7 Cir., 144 F. 2d 423, 435, certiorari denied 323 U.S. 761, 65 S.Ct. 93, 89 L.Ed. 609: "A person does not become an outlaw and lose all rights by doing an illegal act." The court accordingly holds that plaintiff is not precluded or estopped from maintaining this action against the defendant because of illegal gambling activities conducted upon his premises in Indiana.

The defendant contends that the raid was conducted and certain property in Indiana was confiscated, damaged or destroyed pursuant to the orders or directions of the prosecuting attorney of Berrien county, Michigan. However, this contention is no legal defense to plaintiff's claim for damages, as the defendant had no jurisdiction or authority to act other than as a private citizen in Indiana, and the fact that he acted on the erroneous advice of the prosecuting attorney affords him no protection against plaintiff's claim.

Defendant further contends that he cannot be held liable for damages in the present action, because the raid on the plaintiff's premises was a cooperative effort by Indiana and Michigan officers. Although the evidence indicates that the raid and destruction or damaging of plaintiff's property were to some extent a cooperative effort by several groups of police officers and others, it is particularly significant that warrants were not issued in Indiana for the arrest of the operators of the gambling establishment or the patrons thereof, and that they were not charged with any offense under the law of Indiana. In any event, the evidence clearly establishes that the defendant personally took an active part in instigating, commanding, encouraging, approving, and ratifying the raid in all of its manifestations. The eight deputy sheriffs from Berrien county comprised the largest single unit of police officers taking part in the raid, and these deputies were under the control and direction of the defendant. Considering the defendant's own testimony, which in some instances is not convincing, in connection with all other testimony, the court concludes as a fact that the defendant was in principal charge of the raid and that he approved, ratified, condoned, and acquiesced in the confiscation, destruction or damaging of the plaintiff's property, for which he seeks redress in this action. In considering the extent of defendant's participation in the raid, it is significant that he willingly posed for a newspaper photograph, which was put in evidence, showing him destroying one of the mahogany bars in the Sportsmans Club with an axe.

The law is well established that all persons who instigate, command, encourage, advise, ratify or condone the commission of a trespass are cotrespassers and, as such, are jointly and severally liable as joint tortfeasors. In 87 C.J.S. Trespass § 32, pp. 990, 991, it is stated:

"The general rule is that all who wrongfully contribute to the commission of a trespass or assent to its commission or connive therein, or who benefit by it, or who aid, abet, assist, or advise a trespasser in committing a trespass, are equally liable with the one who does the act complained of. * * *

"Joint trespassers may be sued either jointly or severally at plaintiff's election, since each joint trespasser against whom a joint action is brought is liable for the whole injury."

See also Hoesel v. Cain, 222 Ind. 330, 53 N.E.2d 165, 769; Kizer v. Hazelett, 221 Ind. 575, 49 N.E.2d 543; Inter State Motor Freight System v. Henry, 111 Ind. App. 179, 38 N.E.2d 909; Jackson v. Record, 211 Ind. 141, 5 N.E.2d 897; Kniola v. Kozlowski, 75 Ind.App. 2, 129 N.E. 489; Griffin v. Bozeman, 234 Ala. 136, 173 So. 857; Lewis v. Mays, 208 Ark. 382, 186 S.W.2d 178; Melton v. Helms, 83 Ga.App. 71, 62 S.E.2d 663; Christensen v. Frankland, 324 Ill.App. 391, 58 N.E.2d 289; Oyler v. Fenner, 264 Mich. 519, 250 N.W. 296; Hambright v. Walker, 211 S.C. 201, 44 S.E. 2d 310; Fordney v. King County, 9 Wash.2d 546, 115 P.2d 667; State ex rel.

Bumgarner v. Sims, 139 W.Va. 92, 79 S.E.2d 277; 52 Am.Jur. p. 861, § 31.

 From consideration of all the evidence the court concludes that the plaintiff is entitled to recover compensatory damages from the defendant. The plaintiff presented evidence as to his compensatory damages in the amount of $6,397.35 and itemizes such damages as follows: (1) The sum of $3,176.35 for the repair of the damage to building C and the replacement of certain property destroyed or damaged; (2) the sum of $1,221 for the replacement of the air-conditioning system in building C; and (3) the sum of $2,000 for money seized by the defendant over and above the sum of $8,460 admitted by the defendant. A general contractor called as a witness by the plaintiff testified that it would cost $3,176.35 to repair and restore the interior of building C and the other property destroyed or damaged, to the condition they were in before the raid. A general estimate prepared by this contractor and put in evidence itemized the cost of these repairs as follows:

"First floor:

| | |
|---|---:|
| Repair and replace ceiling | $ 115.45 |
| Replace bar | 294.80 |
| Replace threshold front (brass) | 12.00 |
| Replace counter (built-in desk) | 188.40 |
| Stairs: | |
| Replace ceiling | 36.50 |
| Basement: | |
| Back bar replace | 640.00 |
| Front bar replace | 460.00 |
| Ceiling replace (500 sq. ft. at .45) | 225.00 |
| Misc. mill work and material | 234.80 |
| Electric: | |
| Two rooms rewired | 375.00 |
| Painting of walls, ceilings, bars, counters | 487.40 |
| Office: | |
| Replacement of door jamb and trim, locks and glass | 35.00 |
| Replace window sash | 22.00 |
| Upstairs entrance to hall: | |
| Replace jamb and trim | 50.00 |
| | $3,176.35" |

The court is not convinced that the contractor's estimate of a total cost of $3,176.35 is entirely correct. There appears to be some uncertainty as to the amount of damage to the ceilings in the building and the amount of damage to the electrical wiring and as to the number of light fixtures removed. From consideration of all testimony and the photographs put in evidence showing the condition of the ceilings, wiring, and fixtures after the raid, the court concludes that the contractor's estimate for repairing, restoring, and replacing these particular items should be reduced by the sum of $350. Therefore, the contractor's total estimate of $3,176.35 should be reduced by the sum of $350, leaving a balance of $2,826.35. Plaintiff's claim for the sum of $1,221 as the cost of replacing the air-conditioning system in building C was substantiated by the undisputed testimony of the air-conditioning contractor who had originally installed the system, and the court concludes that plaintiff is entitled to recover that amount.

The evidence does not support the plaintiff's claim for $2,000 as an additional amount of money claimed to have been in a cash box in building C when it was seized and removed by defendant or his deputies, over and above the sum of $8,000 which defendant admits was in the box when it was seized. The court is not convinced that there was more than $8,000 in the cash box when it was seized during the raid by defendant or his deputies. The evidence establishes that the defendant took possession of and removed the sum of $460 from the gambling room in building C and took possession of and removed the cash box containing $8,000. The plaintiff's claim for the additional sum of $2,000 is accordingly denied.

Plaintiff claims punitive or exemplary damages. However, the law is well established that such damages are awarded only for the purpose of punishing one party and not for compensating the other, and further, that such damages should not be awarded for injuries to property unless fraud, malice, oppression or other aggravating circumstances accompany the injuries. In Murphy Auto Sales, Inc., v. Coomer, 123 Ind.App. 709, 112 N.E.2d 589, 592, the court said:

"Indiana cases since the fifth Indiana Report have recognized a rule allowing punitive damages which has been characterized by strictness rather than liberality. (Cases cited). * * *

"It seems clear that despite conflicting expressions the courts of this state have recognized punitive or exemplary damages in a proper case. Punitive or exemplary damages do not rest upon any ground of abstract or theoretical justice but upon the basis of an established public policy which seeks to promote the public safety and to punish through the medium of a civil proceeding a fraudulent wrongdoer, and where malice, gross fraud and oppressive conduct is shown punitive damages are allowable to deter other wrong-doers from offending in a like manner."

In Galloway v. General Motors Acceptance Corporation, 4 Cir., 106 F.2d 466, 468, the court said: "Punitive damages are awarded for the purpose of punishing a tort feasor for such an exhibition of recklessness or negligence as evidences malice or the conscious disregard of the rights of others." In Lake Shore & Michigan Southern Railway Co. v. Prentice, 147 U.S. 101, 107, 13 S.Ct. 261, 263, 37 L.Ed. 97, the court said:

"In this court the doctrine is well settled that in actions of tort the jury, in addition to the sum awarded by way of compensation for the plaintiff's injury, may award exemplary, punitive, or vindictive damages, sometimes called 'smart money,' if the defendant has acted wantonly, or oppressively, or with such malice as implies a spirit of mischief or criminal indifference to civil obligations. But such guilty intention on the part of the defendant is required in order to charge him with exemplary or punitive damages."

See also 52 Am.Jur. pp. 878–879; 87 C.J.S. Trespass § 112, p. 1068.

The evidence in the present case does not support plaintiff's contention that defendant's participation in the raid and his conduct were wilful, wanton or malicious. Rather, it reasonably appears that defendant erroneously believed that he was acting within his jurisdiction and authority. The court accordingly holds that plaintiff is not entitled to recover punitive or exemplary damages.

For the reasons herein stated the court concludes that plaintiff is entitled to recover from defendant the sum of $4,047.35, which comprises the sum of $2,826.35 for damages to building C and the destruction or damaging of certain property located therein, and the sum of $1,221 for replacing the air-conditioning system in the building. Judgment will accordingly be entered in favor of the plaintiff and against the defendant for said sum of $4,047.35.